Filed 3/17/25  P. v. Johnson CA2/1
Opinion following transfer from Supreme Court

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>MARK ANTHONY JOHNSON,<br><br>        Defendant and Appellant. | B329386<br><br>(Los Angeles County<br>Super. Ct. No. BA509725) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Lisa B. Lench, Judge.  Affirmed.

Jason Szydlik, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Kenneth C. Byrne and Allison H. Chung, Deputy Attorneys General, for Plaintiff and Respondent.

_____

On the morning of August 2, 2022, defendant Mark Anthony Johnson entered the lobby of an apartment building in the Little Tokyo area of Los Angeles, forcibly took a bag containing valuables from Mauricio C., and fled on a skateboard. Surveillance video footage showed Johnson committing the offense, and Mauricio identified Johnson in a photo lineup on the basis of the prominent tattoos on his face. A jury convicted Johnson of second degree robbery (Pen. Code, § 211), and the trial court sentenced him to six years in prison.

Johnson contends we must overturn his conviction because the prosecutor's use of a peremptory challenge to remove a prospective juror the record identifies as juror No. 40 from the panel violated Code of Civil Procedure section 231.7,[1] a law the Legislature enacted "to put into place an effective procedure for eliminating the unfair exclusion of potential jurors based on race . . . through the exercise of peremptory challenges." (Assem. Bill No. 3070 (2019-2020 Reg. Sess.); Stats. 2020, ch. 318, § 1(a).) We affirm on the ground that Johnson forfeited the claim.

The venire included two Black prospective jurors, jurors No. 40 and No. 49. The prosecution exercised a peremptory challenge on juror No. 40 without objection from Johnson's counsel; that juror then left the courtroom. Several challenges later, the prosecutor sought to exercise a peremptory challenge to juror No. 49. The defense objected based on section 231.7, and in the course of arguing that objection referenced the dismissal of juror No. 40 as showing the purported discriminatory intent in the challenge to juror No. 49. The trial court issued a ruling

_____

[1] Unless otherwise specified, subsequent statutory references are to the Code of Civil Procedure.

2

regarding the exclusion of juror No. 49 without referencing juror No. 40; Johnson's attorney did not follow up and request any ruling from the court as to juror No. 40. On this record, where there is no basis for concluding that Johnson's attorney wanted any further change to the composition of the jury, Johnson may not now use the exclusion of juror No. 40 as a ground for overturning his conviction.

## BACKGROUND ON SECTION 231.7

Prior to the enactment of section 231.7, "trial courts examined peremptory challenges under the three-step inquiry established by *Batson v. Kentucky* (1986) 476 U.S. 79 [106 S.Ct. 1712, 90 L.Ed.2d 69] and *People v. Wheeler* (1978) 22 Cal.3d 258 . . . ." (*People v. Jaime* (2023) 91 Cal.App.5th 941, 943.) The Legislature designed section 231.7 to address "the limitations of the *Batson/Wheeler* inquiry." (*People v. Jaime, supra,* at p. 943.) The author of Assembly Bill No. 3070, which enacted section 231.7, stated that the *Batson/Wheeler* approach "has failed" because it polices only "acts of intentional discrimination." The bill's author wrote, "Courts have acknowledged that it can be difficult and often impossible for the trial judge to determine whether the lawyer making the challenge actually intended to discriminate. . . . Perhaps more important, the existing procedure cannot address strikes exercised because of implicit bias, that is, unconscious or automatic attitudes and stereotypes." (Assem. Com. on Judiciary, Rep. on Assem. Bill No. 3070 (2019-2020 Reg. Sess.) as amended May 4, 2020, p. 6.)

The bill's sponsors noted that several studies and commentators had found the *Batson/Wheeler* approach ineffective, including Justice Goodwin Liu of our Supreme Court, who wrote that, "In adjudicating *Batson* claims in more than 100

3

cases over the past two decades, this court has found unlawful discrimination in jury selection only once . . . . [O]ne need not question the overall excellence and integrity of our prosecutors and trial courts in order to pause and wonder, in light of the remarkable uniformity of this court's *Batson* decisions over the past 20 years, whether we have maintained the proper level of vigilance." (*People v. Harris* (2013) 57 Cal.4th 804, 865 (conc. opn. of Liu, J.).)

Section 231.7 was designed to address these concerns by strengthening the review of peremptory strikes in several ways. First, under the new law, "the party objecting to the peremptory challenge is no longer required to make a prima facie showing of racial discrimination." (*People v. Jaime*, *supra*, 91 Cal.App.5th at p. 943.) Instead, when a party challenges the opponent's use of peremptory challenges under section 231.7, the opponent "shall state the reasons the peremptory challenge has been exercised" (*id.*, subd. (c)), and the court must "evaluate the reasons given to justify the peremptory challenge in light of the totality of the circumstances" and must sustain the objection to the peremptory challenge "[i]f the court determines there is a substantial likelihood that an objectively reasonable person would view race . . . as a factor in the use of the peremptory challenge" (*id.*, subd. (d)(1); accord, *People v. Ortiz* (2023) 96 Cal.App.5th 768, 792-795 [explaining in detail how challenges under § 231.7 are litigated]).

Section 231.7 also instructs the court how to determine whether race or another impermissible consideration was a factor in the peremptory challenge. In particular, "[t]he court shall consider only the reasons actually given and shall not speculate on, or assume the existence of, other possible justifications for the use of the peremptory challenge." (*Id.*, subd. (d)(1).) In addition,

4

the law establishes a presumption against the reliance on justifications for peremptory strikes that appear facially neutral but are "commonly associated with racial and ethnic groups and women." (Assem. Com. on Judiciary, Rep. on Assem. Bill No. 3070, *supra*, p. 10.) These factors include "[e]xpressing a distrust of or having a negative experience with law enforcement or the criminal legal system" (§ 231.7, subd. (e)(1)) and "[h]aving a close relationship with people who have been stopped, arrested, or convicted of a crime" (*id.*, subd. (e)(3)), among several others. These factors are "presumed to be invalid unless the party exercising the peremptory challenge can show by clear and convincing evidence that an objectively reasonable person would view the rationale as unrelated to a prospective juror's race, . . . and that the reasons articulated bear on the prospective juror's ability to be fair and impartial in the case." (*Id.*, subd. (e).) Similarly, a peremptory challenge is presumptively invalid if based on the prospective juror's conduct during voir dire, such as being "inattentive, or staring or failing to make eye contact" (*id.*, subd. (g)(1)(A)), "exhibit[ing] either a lack of rapport or problematic attitude, body language, or demeanor" (*id.*, subd. (g)(1)(B)), or "provid[ing] unintelligent or confused answers" (*id.*, subd. (g)(1)(C)) "unless the trial court is able to confirm that the asserted behavior occurred, based on the court's own observations or the observations of counsel for the objecting party. Even with that confirmation, the counsel offering the reason shall explain why the asserted demeanor, behavior, or manner in which the prospective juror answered questions matters to the case to be tried." (*Id.*, subd. (g)(2).)

Section 231.7 directs that we are to review the denial of an objection to a peremptory challenge "de novo, with the trial

5

court's express factual findings reviewed for substantial evidence. The appellate court shall not impute to the trial court any findings, including findings of a prospective juror's demeanor, that the trial court did not expressly state on the record. The reviewing court shall consider only reasons actually given under subdivision (c) and shall not speculate as to or consider reasons that were not given to explain either the party's use of the peremptory challenge or the party's failure to challenge similarly situated jurors who are not members of the same cognizable group as the challenged juror, regardless of whether the moving party made a comparative analysis argument in the trial court. Should the appellate court determine that the objection was erroneously denied, that error shall be deemed prejudicial, the judgment shall be reversed, and the case remanded for a new trial." (*Id.*, subd. (j).)

## RELEVANT PROCEEDINGS BELOW

At issue in this case is the prosecution's peremptory challenge to juror No. 40; although the prosecution also used a preemptory against the other Black juror in the venire (No. 49), Johnson claims no error in the exclusion of juror No. 49. Nevertheless, we set forth the proceedings as to juror No. 49 as well as juror No. 40 for context.

Voir dire took place in February 2023, more than a year after section 231.7 became effective. Both the court and the prosecution questioned the prospective jurors. The court asked the members of the venire to describe their occupation, living situation, and experience serving on juries. Juror No. 40 and juror No. 49 both answered these questions. The court asked the potential jurors additional questions regarding their experiences with crime and the criminal justice system. Juror No. 40 did not

raise his hand to respond to any of these questions, but juror No. 49 did. In response to the court's question whether the prospective jurors "personally or a close friend or family member [had] ever been arrested for a charge like" robbery, juror No. 49 stated that she had a cousin who was currently incarcerated in Texas. She initially expressed concern that her cousin's experience would make it difficult for her to be fair and impartial, but she later clarified that she believed she could "put that aside." In addition, juror No. 49 stated that she "believe[d that as a] person in my . . . demographic, it's my duty to be on juries when possible." The trial court interpreted this latter statement as a reference to juror No. 49's race, as "there don't appear to be very many people in this panel who are African-American." In response to another question from the court, juror No. 49 stated that she had once been the victim of a car break-in, though she did not believe this would affect her ability to be fair and impartial.

The prosecutor questioned the prospective jurors as a group. The Super Bowl had been played the previous weekend, and the prosecutor used the outcome of that game as an example of a fact that could be proved based on testimony from one individual. The prosecutor asked several of the jurors, "Do we all agree with the principle that someone who watches something can tell you what happened even if they weren't personally there? Anyone disagree with that?" Juror No. 49 responded, "I don't— that's a long analogy." The prosecutor replied, "We are going to get longer" and then proceeded to speak with other jurors.

The prosecutor returned to juror No. 49 with the following colloquy:

Prosecutor: "How do you feel about the Super Bowl?"

Juror No. 49: "I don't really care."

Prosecutor: "Did you watch the Super Bowl?"

Juror No. 49: "I sat there in front of it. I watched the commercials."

Prosecutor: "Do you have one you liked?"

Juror No. 49: "There were drinks happening."

Prosecutor: "I would not call her as a witness."[2]

Still later, the prosecutor continued on the same subject and addressed juror No. 40: "Sometimes people can tell you what happened even if they didn't see every second . . . of the Super Bowl they can tell who won. Anyone disagree with that? . . . So juror [number] 40 you are cringing. You did not watch the Super Bowl?"

Juror No. 40: "I did."

Prosecutor: "You are over it. . . . [You're] sick of hearing about it; is that right?"

Juror No. 40: "Yeah."

Prosecutor: "Okay, we'll move on."

With voir dire complete, the court struck several potential jurors from the panel, and then invited the parties to take turns making peremptory challenges. After several challenges from each side, juror No. 40 took a seat in the jury box, and the prosecution immediately asked the court to thank and excuse him from the panel. As with other excused jurors, the court ordered juror No. 40 to leave the courtroom and "report back to

---

[2] The context suggests that the prosecutor made this comment in a joking manner to suggest he would not call a witness who had been drinking to testify about what they observed.

the jury assembly room."  Following the exercise of three additional challenges, the court added juror No. 49 to the jury box, and the prosecution sought to use a peremptory challenge to strike her.

Johnson's attorney then made "a *Batson-Wheeler*[3] motion. There were only two African-Americans [among the potential jurors], numbers 40 and 49.  [Number] 40 was dismissed by the People.  I understand it's a peremptory challenge but I didn't see a single thing about that person that would have been good, bad, [or] neutral for either side.

"[Number] 49 has a cousin who was arrested but she gave no indication that would affect her ability to be a juror.  I'm seeing nothing apart from the only two Black people being kicked [off] and my client, of course, is African-American."

The prosecutor responded, "So, with respect to juror number 40 and juror number 49, who I just kicked, both were not seemingly not [*sic*] happy with my [Super Bowl] hypothetical.  In fact, I specifically said, 'juror [number] 40 you are cringing.'

"He was over the reference to football.  I specifically said, you know you are tired of talking about football.  But juror Number 49—what she specifically said that concerned me was, initially, before the challenge for cause was denied, she said she had contact with her cousin monthly and that experience [would] bias her.  She explicitly said it would bias her.  She also did not

---

[3] We assume Johnson's attorney misspoke and intended to challenge the peremptory strike under section 231.7, not *Batson/Wheeler*.  The record indicates that both parties and the trial court interpreted the motion in this manner.

seem to like my football example. She said, 'I'm not following anything you're saying.' "

The court responded, "The football analogy and anybody's reaction to the football analogy is not a valid basis to overcome any presumption in this matter as far as I am concerned."

From that point forward, the prosecutor, defense attorney, and trial court discussed juror No. 49 alone, with no further reference to juror No. 40. The prosecutor justified his decision to strike juror No. 49 based on the prosecutor's initial concern that juror No. 49 might be biased as a result of her cousin's experience with the criminal justice system. In addition, the prosecutor stated that juror No. 49 appeared to be too eager to serve on the jury. The prosecutor also expressed concern that juror No. 49 "didn't really seem to care" about her experience as a victim of a car break-in, and that her statement "I think it's important for me to participate" suggested that "she's going to factor Mr. Johnson's race improperly" in deciding the case. Johnson's attorney took issue with these claims.

The trial court ruled as follows: "What I need to find in order to overrule the objection is that there is not a substantial likelihood that race is a factor in the use of the objection. . . . I think there are valid reasons that the People have given for excusing her, particularly her initial reaction when it came to discussion about her cousin. But I also think that she was clearer at the end that she could be fair. All that being said, I don't think that it's racially motivated. I think it is unfortunate there aren't more African-Americans on the panel, but with regard to excusing her, I don't think race is a factor. I don't think there is a substantial likelihood that race is a factor in the challenge. I'm going to allow the challenge." The court did not

10

mention juror No. 40 in this ruling, and Johnson's attorney did not ask the court to make any ruling regarding the prosecutor's exercise of a peremptory challenge with respect to juror No. 40.

## DISCUSSION

Johnson contends that the use of a peremptory challenge on juror No. 40 violated section 231.7, and that we must therefore reverse his conviction and remand the case for a new trial. (See *id.*, subd. (j).) The Attorney General argues that Johnson forfeited the issue by failing to secure a ruling from the trial court as to juror No. 40. We agree with the Attorney General.

Our Supreme Court has long held that "[t]he failure to articulate clearly a *Wheeler/Batson* objection forfeits the issue for appeal. (*People v. Lewis* (2008) 43 Cal.4th 415, 481, citing *People v. Gallego* (1990) 52 Cal.3d 115, 166.) The rule that a party that fails to raise a claim before the trial court may forfeit " ' "a constitutional right," or a right of any other sort' " serves " 'to encourage parties to bring errors to the attention of the trial court, so that they may be corrected. [Citation.]' [Citations.]" (*In re Sheena K.* (2007) 40 Cal.4th 875, 880, 881.) That rationale applies with particular force in the context of jury selection, where a court may address a potential error easily before trial begins, rather than waste time and judicial resources on a trial before the defendant seeks for the first time to overturn the jury's verdict on appeal. In the absence of a clear signal to the contrary, we assume the Legislature intended for the forfeiture rule to apply to challenges under section 231.7 in situations such as this one before us.

We question in the first instance whether Johnson's trial counsel ever objected to the use of a peremptory challenge against juror No. 40. No objection was made at the time of the

11

challenge to juror No. 40. When juror No. 49 was challenged, Johnson's counsel brought up the challenge as to juror No. 40 seemingly as context for why he believed the challenge to juror No. 49 was racially based, but he did not make a similar claim as to juror No. 40. This would appear to explain why the court made no ruling regarding section 231.7 as to juror No. 40, and why defense counsel did not follow up to obtain such a ruling.

Further bolstering the conclusion that Johnson's attorney did not object to the use of the peremptory strike on juror No. 40 is that he did not seek any of the remedies available under section 231.7 for the use of that strike. These ranged from seeking to reseat juror No. 40 (*id.*, subd. (h)(3))[4] to quashing the venire and restarting jury selection (*id.*, subd. (h)(1)). Because the prosecutor exercised the peremptory strike the moment juror No. 40 sat down, Johnson's attorney never had an opportunity to state whether he was satisfied with the panel that included juror No. 40. Indeed, the only statement by defense counsel regarding juror No. 40 was one of indifference: "I didn't see a single thing about [juror No. 40] that would have been good, bad, [or] neutral for either side." Johnson's attorney might have decided not to request to quash the venire and restart jury selection or seek other relief because he was satisfied with the existing panel, or at most that he saw no likely advantage in seeking a change. After the court overruled his objection to the People's challenge to juror No. 49, Johnson's attorney exercised a peremptory challenge to

---

[4] The trial court had ordered juror No. 40 to return to the jury assembly room shortly before it made its ruling on juror No. 49, and nothing in the record suggests that Johnson's attorney was prevented from requesting the juror return.

one of the other jurors.  Although both the prosecution and defense had peremptory challenges still available, both sides then accepted the panel as constituted and jury selection concluded.  It is far less likely that, having just challenged juror No. 49, Johnson's counsel simply forgot to ask the court to rule on juror No. 40.[5]

Even if we construe defense counsel's statement that "I understand it's a peremptory challenge but I didn't see a single thing about [juror number 40] that would have been good, bad, [or] neutral for either side" as a section 231.7 challenge to the peremptory challenge to juror No. 40, Johnson concedes that his trial counsel failed to secure a ruling on such an objection.  Johnson argues that the forfeiture rule should not apply "because the record here shows how the court would have ruled."  He notes that the only justification the prosecutor expressed for excluding juror No. 40 was the juror's apparent dislike of the prosecutor's Super Bowl analogy, which the court described as "not a valid basis to overcome any presumption in this matter as far as I am concerned."  Thus, in Johnson's view, the record shows that the court would have rejected the use of a peremptory challenge as to juror No. 40 if asked to rule on the issue.

We are not persuaded.  Because the parties discussed juror No. 40 only briefly, and in the context of a challenge to juror No. 49, the record does not provide a full account of the prosecutor's reasoning for using the peremptory strike against

---

[5] Because Johnson's attorney appears to have elected for tactical reasons not to challenge the exclusion of juror No. 40, we reject Johnson's argument that the failure to do so constituted ineffective assistance of counsel.

juror No. 40.  Although juror No. 40 said nothing during voir dire apart from stating his occupation, lack of prior jury experience, and his dislike of the prosecutor's extensive use of Super Bowl analogies, factors not reflected in the reporter's transcript may have justified the use of the peremptory strike.  We can only speculate as to how the trial court would have ruled on the use of the peremptory strike as to juror No. 40 if, once defense counsel requested a ruling, the prosecutor had stated his full reasons for using the strike and both parties had argued the matter.  Section 231.7 forbids us from "imput[ing] to the trial court any findings, including findings of a prospective juror's demeanor, that the trial court did not expressly state on the record," and requires us to "consider only reasons actually given" by the prosecutor "and . . . not speculate as to or consider reasons that were not given to explain . . . the [prosecutor]'s use of the peremptory challenge." (*Id.*, subd. (j).)  In this context, where a ruling was not requested, the prosecutor did not explain his reasoning fully, and the trial court did not make formal findings as to juror No. 40, to analyze Johnson's challenge as if these things had occurred would unfairly tilt the analysis in Johnson's favor.

Our decision today does not compromise the Legislature's purpose in enacting section 231.7 to address lingering problems with the use of peremptory strikes against members of minority groups.  We merely require that an attorney who wishes to invoke the protection of section 231.7 do so before the trial court. In the absence of a clear challenge and request for a ruling on juror No. 40, that juror's presence or absence from the jury does not call into question the validity of Johnson's conviction.

14

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED

WEINGART, J.

We concur:

BENDIX, Acting P. J.

M. KIM, J.

15